# United States Court of Appeals
## For the First Circuit

No. 21-1479

CITY OF MIAMI FIRE FIGHTERS' AND POLICE OFFICERS' RETIREMENT
TRUST, individually and on behalf of all other persons similarly
situated; INTERNATIONAL UNION OF OPERATING ENGINEERS PENSION
FUND OF EASTERN PENNSYLVANIA AND DELAWARE, individually and on
behalf of all other persons similarly situated,

Plaintiffs, Appellants,

v.

CVS HEALTH CORPORATION; LARRY J. MERLO; DAVID M. DENTON;
JONATHAN C. ROBERTS; ROBERT O. KRAFT; EVA C. BORATTO,

Defendants, Appellees.

---

APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF RHODE ISLAND

[Hon. Mary S. McElroy, U.S. District Judge]

---

Before

Lynch, Kayatta, and Gelpí,
Circuit Judges.

---

Jeremy A. Lieberman, with whom Brian Calandra, Patrick V.
Dahlstrom, Pomerantz LLP, James E. Miller, Eric L. Young, Jayne A.
Goldstein, Miller Shah LLP, Robert D. Klausner, Stuart Kaufman,
Klausner, Kaufman, Jensen & Levinson, Stephen Cypen, and Cypen &
Cypen were on brief, for appellants.
Steven M. Farina, with whom George A. Borden, Amanda M.
MacDonald, Michael J. Mestitz, Elizabeth A. Wilson, Williams &
Connolly LLP, Robert C. Corrente, and Whelan Corrente & Flanders
LLP were on brief, for appellees.

August 18, 2022

**KAYATTA**, **Circuit Judge**. Two retirement funds brought this putative securities fraud class action against CVS Health Corporation arising out of difficulties CVS Health experienced in the wake of its acquisition of Omnicare, Inc., a company that provides pharmacy services to long-term care facilities. Plaintiffs allege that executives of CVS Health and its newly acquired subsidiary employed false statements and misleading nondisclosures to conceal from investors for more than three years the disintegration of Omnicare's customer base that eventually led to a series of write-offs totaling more than $8 billion. The district court dismissed plaintiffs' complaint because it failed to allege any actionable false statements or misleading omissions. On careful de novo review, we find that the district court's assessment was on the mark. We therefore affirm the dismissal and the subsequent denial of plaintiffs' attempt to revisit the judgment. Our reasoning follows.

**I.**

As this case comes to us on a motion to dismiss, we draw the facts from the operative Amended Class Action Complaint ("the complaint") and certain of CVS Health's public filings with the Securities Exchange Commission (SEC). See Fire & Police Pension Ass'n of Colo. v. Abiomed, Inc., 778 F.3d 228, 232 n.2 (1st Cir. 2015) (considering public SEC filings among other undisputed records at the motion-to-dismiss stage); Watterson v. Page, 987

F.2d 1, 3 (1st Cir. 1993) (noting "narrow exceptions" to the traditional rule barring consideration of materials outside the complaint, including for documents whose authenticity is not disputed).

**A.**

Headquartered in Woonsocket, Rhode Island, CVS Health is a publicly traded company that provides integrated pharmacy healthcare services and operates thousands of retail stores and clinics across the United States. In 2015, CVS Health acquired Omnicare, then the leading provider of pharmaceutical services to long-term care (LTC) facilities.[1] Plaintiffs allege that the newly acquired LTC business subsequently "hemorrhaged" customers due to CVS Health's mismanagement, including its decision to centralize and standardize a number of operations that Omnicare had previously tailored to each customer. According to the complaint, CVS Health misleadingly concealed these customer losses and their causes so as not to threaten CVS Health's ability to acquire financing for another large acquisition planned for 2018. The purported class period spans from allegedly misleading statements made in February

---

[1] CVS Health's subsidiary, CVS Pharmacy, Inc., entered the agreement to acquire Omnicare in May 2015, with the acquisition closing that August. For ease of discussion, we refer to this acquisition throughout our opinion as the action of the parent reporting entity, CVS Health.

2016 through the ultimate disclosure of the full extent of Omnicare's lost value in February 2019.

### B.

In gauging whether plaintiffs have pleaded facts sufficient to proceed with their claim that CVS Health misled investors about the difficulties encountered with the acquired Omnicare LTC business, we begin the fact that between 2016 and 2019 CVS Health repeatedly and publicly wrote off chunks of the $8.6 billion in goodwill[2] originally assigned to the Omnicare acquisition. The first negative disclosure concerning the LTC business came on November 8, 2016, when, in the third-quarter Form 10-Q filing,[3] CVS Health reported a reduced goodwill balance of

---

[2] "Goodwill" is an accounting term that refers to the value of anticipated future financial results of an asset, as initially measured by the difference between the price paid for the asset and its fair value. Under Generally Accepted Accounting Principles, the acquiring company must test its goodwill allocation at least annually, as well as in response to events or circumstances that would likely impair the asset's goodwill. See City of Dearborn Heights Act 345 Police & Fire Ret. Sys. v. Align Tech., Inc., 856 F.3d 605, 611 (9th Cir. 2017) (citing Financial Accounting Standards Board Accounting Standards Codification (ASC), Topic 350: Intangibles—Goodwill and Other, ASC 350-20-35-28)). "Impairment is the condition that exists when the carrying amount of goodwill exceeds its implied fair value." Id. (quoting ASC 350-20-25-30).

[3] The SEC requires public companies to file a comprehensive report about their financial performance, called a Form 10-Q, at the end of the first three quarters of each fiscal year. 17 C.F.R. § 249.308a. Full-year financials are reported annually in the Form 10-K, shortly after the fourth quarter concludes. See id. § 249.310.

- 5 -

only $6.3 billion for the acquired LTC business.  The filing stated that while some reporting units "exceed[ed] their carrying values by significant margins," the LTC business exceeded its carrying value by just 7%.  During a presentation to investors and analysts the following month, CVS Health's then-Chief Financial Officer (CFO) David Denton warned that "[a]s for the retail Long-Term Care segment, it will be a challenging year.  Revenue growth is expected to be flat to down 1.5%."

This downward reporting trend continued.  The following year, on November 6, 2017, CVS Health disclosed that the fair value of the LTC business now exceeded its carrying value by only "approximately 1%."  In the same 10-Q filing, CVS Health also explained that its cash-flow projections for the LTC unit had declined because of "customer reimbursement pressures, industry trends such as lower occupancy rates in skilled nursing facilities, and client retention rates."  Finally, it cautioned that:

> If we do not achieve our forecasts, given the small excess of fair value over the related carrying value, as well as current market conditions in the healthcare industry, it is reasonably possible that . . . the LTC reporting unit could be deemed to be impaired by a material amount.

Six months later, on May 2, 2018, CVS Health issued similar warnings about the challenges facing the LTC business -- including client retention -- and the possibility of an impairment. Then, in the second-quarter 10-Q issued on August 8, 2018, the

company reported that it had conducted an interim goodwill test resulting in the impairment of the LTC unit's goodwill to the tune of $3.9 billion. Even with this write-down, CVS Health warned that, due to client retention rates and other specified challenges, "it is reasonably possible in the near term that the goodwill of the LTC reporting unit could be deemed to be impaired again by a material amount."

As predicted, the bad news continued. In February 2019, CVS Health recognized a further impairment of $2.2 billion assessed in the fourth quarter of 2018. In so doing, the company identified "client retention rates" as one of several factors that contributed to the declining value of the business. In this manner, the goodwill value of the LTC business shrank from the initial value of $8.6 billion in May 2015 to just $431 million at the end of 2018.

## C.

Plaintiffs claim that this escalating disclosure of difficulties with the LTC business and write-downs of goodwill came too late. They also point to numerous statements by senior management that plaintiffs say misled investors by either affirmatively misrepresenting or omitting material facts. We group these alleged statements into five buckets for ease of discussion.

The first group concerns representations about the condition and financial performance of the LTC business. For example, the fiscal year 2015 Form 10-K filed in February 2016 stated that CVS Health's "segments benefited from the Omnicare acquisition" and that an increase in net revenues for the Retail/LTC Segment -- a business reporting unit containing both the LTC business and CVS Health's much larger preexisting retail business -- "was primarily driven by the acquisition of Omnicare." The quarterly and annual filings for 2016 then echoed these sentiments in substantially similar language. The complaint asserts generally that this category of statements was "materially false and misleading," though it does not allege any revenue information contrary to the statements. The most specific descriptions of these statements instead allege that these statements were misleading because they gave a positive impression of the business without disclosing that Omnicare LTC customers were fleeing.

Second, in December 2016, Denton allegedly claimed at an annual investor conference that CVS Health had "a leadership position in long-term care with Omnicare." Chief Executive Officer (CEO) Larry Merlo then reiterated during a second-quarter 2017 analyst call that "Omnicare remains the leader in the market." The complaint generally alleges that these statements were "false

and misleading" because they omitted information about customer exodus.

Third, plaintiffs take issue with statements that they contend overstated CVS Health's understanding of its LTC customers. The company in multiple 2017 filings said that pharmacy revenue in the umbrella reporting unit containing both its LTC and larger retail businesses "continued to benefit from [CVS Health's] ability to attract and retain managed care customers." It also reiterated in nearly all quarterly and annual filings throughout the class period a general "Overview of Our Business" section that touted CVS Health's "deep understanding of [consumers', payors', and providers'] diverse needs through [CVS Health's] unique integrated model." More specifically to the LTC business, Merlo on investor calls in August 2016 and August 2017 stated that the company was "[w]orking with our LTC clients to address currently unmet needs of their residents," and that it had "invested the time and capital . . . to get the right technology and processes in place in order to differentiate our offering to make it more compelling for our clients as well as the residents at these facilities." The complaint alleges that these statements were false and misleading because defendants did not in fact understand their LTC customers' needs and many of these customers were fleeing CVS Health due to poor customer service.

Fourth, plaintiffs call out a series of statements about CVS Health's realization of "synergies" between its existing retail pharmacy business and its new LTC business. For example, at the outset of the class period in February 2016, Merlo reported on an earnings call with analysts and investors that "Omnicare performed well and in line with our expectations as we began to realize some of the anticipated synergies." Merlo then reiterated in a May 2016 earnings call that the LTC business "benefited from some of the anticipated costs and sourcing synergies." The complaint alleges that these statements touting "synergies" were false and misleading because it was in fact the "synergies" implemented by CVS Health that caused LTC customers to leave.

Fifth, the complaint alleges that the company's "boilerplate" statements of risks facing the LTC business, as repeated in SEC filings throughout the class period, misleadingly purported to alert investors to only future risks that were, in fact, "already occurring." These statements cautioned, for example, that "[t]here can be no assurance that we will be able to win new business or secure renewal business on terms as favorable to us as the present terms" and observed that "[p]otential difficulties that may be encountered in the [acquisition]

- 10 -

integration process include . . . [r]etaining existing customers and attracting new customers."[4]

**D.**

To support their theory that the goodwill write-downs were too late and the foregoing statements from the company duped the investing public, plaintiffs rely on evidence proffered by their nineteen confidential witnesses (CWs), comprised of former CVS Health or Omnicare employees. The CWs offer a broad array of anecdotes concerning legacy Omnicare customers that CVS failed to retain in the years following the acquisition. An example conveys the nature of these allegations:

> [Confidential Witness 4 (CW4)] both saw personally and learned from contacts in the LTC industry that Omnicare LTC divisions in Illinois and Missouri, and particularly the St. Louis region, lost at least 50% of their business from 2015 to 2019. CW4 said that the customers who left CVS Health were largely poached by former Omnicare and CVS Health employees.

---

[4] The complaint also identified as a separate category of misrepresentations certain executive defendants' certifications that each SEC filing was complete, accurate, and compliant with applicable law, which plaintiffs allege were false and misleading because the filings in fact contained false information and did not therefore comply with applicable law. But these certification statements are only alleged to be false or misleading to the extent the other alleged statements within those filings were, so we need not discuss the certifications as a distinct category of misrepresentations.

In February 2019, plaintiffs commenced this lawsuit against CVS Health, its CEO Merlo, and its former CFO Denton. Shortly thereafter, the parties agreed that those defendants need not respond to the original complaint. Rather, after the appointment of a lead plaintiff and lead counsel, counsel served an amended complaint on those and several additional CVS Health defendants in late July 2019.[5] That Amended Class Action Complaint is now the operative complaint.

The complaint includes claims for violations of section 10(b) of the Securities Exchange Act of 1934 ("the Exchange Act"), codified at 15 U.S.C. § 78j(b), and its implementing SEC Rule 10b-5, codified at 17 C.F.R. § 240.10b-5, as well as section 20(a) of the Exchange Act, codified at 15 U.S.C. § 78t(a). Defendants moved to dismiss the complaint for failure to state a claim, pursuant to Federal Rule of Civil Procedure 12(b)(6). In plaintiffs' opposition to the motion to dismiss, they wrote: "If the Court grants any portion of the Motion, Plaintiffs respectfully request an opportunity to move for leave to amend pursuant to [Federal] Rule [of Civil Procedure] 15(a)(2)." The district court

---

[5] The other individual defendants include Jonathan Roberts (Executive Vice President (EVP) and Chief Operating Officer of CVS Health, starting in March 2017), Robert Kraft (former EVP of CVS Health and President of Omnicare from August 2015 to October 2017), and Eva Boratto (EVP and CFO of CVS Health starting in November 2018).

heard argument on the motion on September 16, 2020 and ultimately granted the motion in full on February 11, 2021, dismissing the amended complaint with prejudice after finding that it failed to allege any materially false or misleading statements. City of Mia. Fire Fighters' & Police Officers' Ret. Tr. v. CVS Health Corp., 519 F. Supp. 3d 80, 87-90, 94, 97-98 & n.21 (D.R.I. 2021). The district court did not reach defendants' alternative argument that the complaint failed to adequately plead the element of scienter. Id. at 28 n.21.

Four weeks later, plaintiffs moved the court under Rule 59(e) to reconsider its ruling so as to permit plaintiffs to amend the complaint for a second time. With this motion, they included a Proposed Second Amended Class Action Complaint containing additional allegations. Unpersuaded, the district court denied the motion to reconsider and the request for further amendment. Plaintiffs then appealed that ruling along with the grant of the motion to dismiss.

### III.

### A.

Having described the course of proceedings and the gist of plaintiffs' allegations, we turn now to the merits of plaintiffs' appeal. We begin with plaintiffs' challenge to the district court's order granting defendants' motion to dismiss. We review this challenge de novo, "accept[ing] well-pleaded factual

allegations in the complaint as true and . . . view[ing] all reasonable inferences in the plaintiff[s'] favor." Constr. Indus. & Laborers Joint Pension Tr. v. Carbonite, Inc., 22 F.4th 1, 6 (1st Cir. 2021).

### 1.

At the outset, we note that the viability of plaintiffs' section 20(a) claim for control-person liability is contingent on their section 10(b) claim, and no party argues here that one claim ought stand should the other fall. See Mehta v. Ocular Therapeutix, Inc., 955 F.3d 194, 211 (1st Cir. 2020) ("A claim brought under section 20(a) is . . . derivative of a claim alleging an underlying securities law violation."). We thus proceed to consider the viability of the section 10(b) claim as dispositive of the whole complaint.

Section 10(b) of the Exchange Act prohibits the use, "in connection with the purchase or sale of any security[,] . . . [of] any manipulative or deceptive device or contrivance in contravention of such rules and regulations as the [SEC] may prescribe as necessary or appropriate in the public interest or for the protection of investors." 15 U.S.C. § 78j(b). SEC Rule 10b-5 is such a rule, implementing section 10(b)'s prohibition by making it unlawful to "make any untrue statement of a material fact or to omit to state a material fact necessary in order to make the statements made, in the light of the

circumstances under which they were made, not misleading." 17 C.F.R. § 240.10b-5(b).

Stating a claim under section 10(b) and Rule 10b-5 requires the pleading of six elements: "(1) a material misrepresentation or omission; (2) scienter; (3) a connection with the purchase or sale of a security; (4) reliance; (5) economic loss; and (6) loss causation." Carbonite, 22 F.4th at 6 (quoting In re Biogen Inc. Sec. Litig., 857 F.3d 34, 41 (1st Cir. 2017)). Additionally, Federal Rule of Civil Procedure 9(b) requires plaintiffs claiming fraud to "state with particularity the circumstances constituting fraud." Complaints alleging securities fraud specifically are also subject to the heightened pleading requirements of the Private Securities Litigation Reform Act (PSLRA), including the mandate that plaintiffs "specify each statement alleged to have been misleading, [and] the reason or reasons why the statement is misleading." 15 U.S.C. § 78u-4(b)(1). Against the backdrop of these heightened pleading requirements, our analysis begins and ends with the first of the section 10(b) elements, as we agree with the district court that the complaint fails to allege a material misrepresentation or omission.

For allegedly false statements to support a claim of securities fraud, they must be "false when made." Gross v. Summa Four, Inc., 93 F.3d 987, 994 (1st Cir. 1996); see also Karth v. Keryx Biopharms., Inc., 6 F.4th 123, 135 (1st Cir. 2021) ("[A

- 15 -

plaintiff] may not plead 'fraud by hindsight'; i.e., a complaint 'may not simply contrast a defendant's past optimism with less favorable actual results' in support of a claim of securities fraud." (quoting ACA Fin. Guar. Corp. v. Advest, Inc., 512 F.3d 46, 62 (1st Cir. 2008))). Moreover, "[section] 10(b) and Rule 10b-5(b) do not create an affirmative duty to disclose any and all material information. Disclosure is required under these provisions only when necessary 'to make . . . statements made, in light of the circumstances under which they were made, not misleading.'" Matrixx Initiatives, Inc. v. Siracusano, 563 U.S. 27, 44 (2011) (omission in original) (quoting 17 C.F.R. § 240.10b-5(b)). Thus, a theory of securities fraud liability premised on nondisclosure or omission must also rest on some statement that, absent disclosure, misleads as to a contemporaneous material fact.

**2.**

Close review of the complaint reveals that, despite its length, it fails to allege sufficiently specific facts about the state of the LTC business at particular points in time to enable us to conclude that any of the goodwill write-downs were too late or that any of defendants' alleged misstatements contradicted the state of that business as it then stood. Plaintiffs thus fail to allege that defendants made statements of fact that were false when made or misleadingly incomplete in light of contemporaneous circumstances.

- 16 -

We start with the parties' point of agreement: the condition of the LTC business at either end of the class period. Between the May 2015 acquisition and the end of the class period in February 2019, the Omnicare business suffered a material reduction in value on the order of $8 billion. The dispute centers therefore on whether the complaint alleges facts demonstrating -- "with particularity," Fed. R. Civ. P. 9(b) -- that defendants misrepresented the existence, extent, nature, or pace of that reduction as it occurred. But the complaint provides us with no meaningful way to compare defendants' disclosures and statements about the LTC business with the contemporaneous state of the business. The district court was especially critical of the complaint's failure to juxtapose the proffered reports of lost customers with what CVS was disclosing at the time of those losses. See CVS Health, 519 F. Supp. 3d at 88–89, 97. In the wake of that criticism, one would have expected perhaps a timeline in plaintiffs' brief on appeal. One would have been disappointed.

We have nevertheless reviewed the complaint's forty-six paragraphs alleging customer losses and have identified just six that attempt to place losses within specific periods of time -- and even then, only in highly general terms. The following summarized allegations from the complaint contain references to the timing of a customer loss:

1. One CW, who worked for a former "Omnicare LTC customer with four campuses and approximately 850 to 900 beds," fired CVS Health as its LTC provider and moved to a competitor "in 2016."

2. Omnicare competitor Remedi SeniorCare "had been taking Omnicare customers who were leaving or had left CVS Health since 2015."

3. "Omnicare LTC divisions in Illinois and Missouri, and particularly [in] the St. Louis region, lost at least 50% of their business from 2015 to 2019." This included one client operating "a large number of nursing homes in Missouri" that withdrew its business from CVS Health "in 2016."

4. Omnicare competitor Polaris Pharmacy Services "took 30% of the Omnicare LTC business in South Florida in 2016."

5. "In 2015," Omnicare competitor Modern Health Pharmacy "took 10% to 15% of Omnicare's business in California."

6. An Omnicare affiliate in New York called MedWorld lost 75% of its 22,000 beds "almost immediately after the [Omnicare] Acquisition" with "another 15% of the beds . . . lost thereafter," such that, "only 18 months

after the Acquisition, the MedWorld location where CW13 worked closed."

Two of these allegations cover such broad swaths of time that they effectively provide no date limitation. The second describes a particular competitor who had been pulling an unspecified number of CVS customers "since 2015." The third notes that a regional division of Omnicare suffered customer losses "from 2015 to 2019." For all we can discern from these capacious timeframes, these two losses may not have come anywhere close to their ultimate scale until shortly before the complaint was filed. And we certainly have no basis for finding that CVS Health experienced these losses before it took an appropriate write-down or made an inconsistent statement -- indeed, that some losses of customers occurred "since 2015" or "from 2015 to 2019" is entirely consistent with CVS Health's reporting.

As to the other four allegations that are tethered to some more precise timeframe, the complaint paints with only a slightly finer brush. It alleges customers left CVS only within particular years; i.e., one competitor poached customers "in 2015," two others did so "in 2016," and an Omnicare affiliate pharmacy in New York lost most of its customers "immediately after

the Acquisition" such that a particular site of that affiliate closed "18 months after the Acquisition."[6]

Of these four losses of customers, only the first ("in 2015") definitively occurred prior to the first disclosed goodwill write-down (in November 2016). But the complaint provides us with no reason to think that that 2015 loss by itself was both material and not offset by new business. Nor does the complaint offer any reason to regard the alleged loss of some customers in 2016 as anything but consistent with the general negative trend of CVS Health's goodwill write-offs beginning in 2016 and its statement in 2017 that issues with "client retention rates" contributed to declining revenues in the prior year. Cf. Ponsa-Rabell v. Santander Sec. LLC, 35 F.4th 26, 35 (1st Cir. 2022) ("[I]t is not a material omission to fail to point out information of which the market is already aware." (quoting Baron v. Smith, 380 F.3d 49, 57 (1st Cir. 2004))).

---

[6] Plaintiffs' appellate brief did not facilitate our attempt to locate in time the complaint's allegations of customer loss, as the brief attributes to several alleged losses more specific time periods than actually pleaded. The brief claims that two specified sets of lost customers -- one comprising several skilled nursing facilities in upstate New York and a second set comprising customers poached by competitor Remedi -- occurred "by the end of 2015." In fact, the complaint alleges that the New York customers were lost "in the aftermath of the acquisition" and that Remedi had been poaching customers "since 2015." Elsewhere, the brief claims that two specified losses (in California and New York) were suffered "shortly after the Acquisition" when only one of these was alleged as such in the complaint.

Plaintiffs' concession that they "do not dispute anything about Defendants' accounting," which necessarily includes the figures included in the company's goodwill reports throughout the class period, reinforces the gap in their pleading. For accurate figures to mislead, plaintiffs would need to point us to some more concrete and inaccurate conclusions that those figures would invite, not just pockets of customer loss that may very well have been entirely consistent with the reported goodwill diminution. Nor can we simply infer that because CVS Health eventually wrote off the goodwill assigned to the Omnicare acquisition that it should have done so sooner. See In re Cabletron Sys., Inc., 311 F.3d 11, 37 (1st Cir. 2002) ("[P]laintiffs may not simply seize upon disclosures made later and allege that they should have been made earlier." (alteration in original) (quoting Berliner v. Lotus Dev. Corp., 783 F. Supp. 708, 710 (D. Mass. 1992))).

Plaintiffs' failure to establish a reasonably clear timeline of customer losses inconsistent with the company's goodwill disclosures is representative of the complaint's overarching failure to allege material facts inconsistent with defendants' public statements. To start, plaintiffs allege that CVS Health misled investors in December 2016 and in the second quarter of 2017 by publicly invoking Omnicare's position as a "leader" in the LTC market. But the complaint never alleges that

Omnicare was in fact not the market leader -- even by the end of the class period, long after these statements were made.[7] Similarly, plaintiffs point to repeated statements in filings starting shortly after the acquisition indicating that the Retail/LTC Segment's revenue gains were primarily driven by the Omnicare acquisition. But, again, they do not challenge any reported accounting metrics and do not allege that the Omnicare acquisition in fact failed to contribute substantial revenue.

Plaintiffs also allege that CVS Health misleadingly touted its understanding of LTC customers, but they marshal a series of statements that do no such thing. Most of these statements refer not to customers of the LTC business but to a much broader universe of customers -- those of the umbrella Retail/LTC Segment or the "consumers, payors, and providers" serviced by the entirety of CVS Health.[8] Several other statements

_____

[7] Plaintiffs claim that several district court cases support their argument that "[s]tatements characterizing a business as a leader [are] misleading when the business is materially declining." But none of these cases even suggest, much less hold, that a claim of leadership is false or misleading merely because the size of the lead has materially shrunk. See Ark. Pub. Emp. Ret. Sys. v. GT Solar Int'l, Inc., No. 08-cv-312, 2009 WL 3255225, at *7-11 (D.N.H. Oct. 7, 2009); Scritchfield v. Paolo, 274 F. Supp. 2d 163, 175 (D.R.I. 2003); In re Lucent Techs., Inc. Sec. Litig., 217 F. Supp. 2d 529, 546, 557 (D.N.J. 2002).

[8] Plaintiffs' brief on appeal recasts one of these alleged statements concerning customer needs to make it appear as if the statement referred specifically to the LTC business. The complaint alleges that all of the class-period SEC filings stated CVS Health was:

- 22 -

discuss efforts taken to improve the experience of LTC customers, but the complaint never alleges that CVS Health failed to take these efforts.  For example, plaintiffs point to Merlo's statement in August 2017 that "[w]e have invested the time and capital over the past two years to get the right technology and processes in place in order to differentiate our offering."  Rather than alleging that the company in fact did not invest in technology and processes to "differentiate [its] offering," plaintiffs contend only that some customers chose to leave CVS Health in part because of new technologies and processes.  That outcome plainly is not inconsistent with Merlo's statement that the company invested in those operations with different aims in mind.

_____

> the only integrated pharmacy health care company with the ability to impact consumers, payors, and providers with innovative, channel-agnostic solutions to complex challenges managing costs and care.  We have a deep understanding of their diverse needs through our unique integrated model . . . .

This statement appears in the CVS Health filings in a section headed "Overview of Our Business," which summarizes the business of the entire CVS Health Corporation, including its "9,800 retail locations, more than 1,100 retail health care clinics, [and, among other services,] leading pharmacy benefits manager."  Plaintiffs' brief, however, inserts a bracketed revision when quoting from the above statement such that it purportedly refers to "the LTC business's 'deep understanding of [our LTC customers'] diverse needs.'"  The full quote above makes plain that the phrase "their diverse needs" refers in context to the needs of "consumers, payors, and providers" -- for the entire CVS Health enterprise -- rather than plaintiffs' preferred recasting.

- 23 -

As to the fifth category of alleged misrepresentations, plaintiffs' briefing castigates defendants' general public references to anticipated and realized "synergies" from the Omnicare acquisition. But while their CWs identify several of CVS Health's business operations decisions that allegedly alienated LTC customers by providing less personalized service, the complaint points to no specific instance where a defendant claimed -- contrary to then-existing facts -- that a particular business operation was succeeding.[9] Moreover, defendants' statements frequently paired the realization of synergies with cost savings, a potential benefit of centralized business operations as to which the complaint is totally silent.[10]

---

[9] We note that Merlo's February 2016 "synergies" statement also refers positively to corporate performance: "Omnicare performed well and in line with our expectations as we began to realize some of the anticipated synergies." To the extent plaintiffs' concerns are with this statement's representation about performance (i.e., "Omnicare performed well") rather than its characterization of "synergies," we have already explained why the complaint provides us with no basis for deeming such statements false or misleading when made.

[10] In addition to the complaint's failure to allege facts contrary to this category of statements, we are also skeptical that statements touting anticipated or realized "synergies" from a corporate merger, untethered to some objective indicator, would be specific enough to constitute a statement of material fact. Such statements may fairly be characterized as "loosely optimistic statements that are so vague [or] so lacking in specificity . . . that no reasonable investor could find them important to the total mix of information available." Shaw v. Digit. Equip. Corp., 82 F.3d 1194, 1217 (1st Cir. 1996).

To be sure, statements need not be literally false to give rise to liability under section 10(b). Statements that are literally true may nonetheless omit information necessary to prevent them from steering investors toward inaccurate conclusions. See SEC v. Johnston, 986 F.3d 63, 72 (1st Cir. 2021) ("[Statements] can also be misleading if they are half-truths, painting a materially false picture in what they say because of what they omit."). But those conclusions must still be inaccurate as of the time the statements were made. See 17 C.F.R. § 240.10b-5(b) (prohibiting the omission of facts necessary to prevent statements from being misleading "in the light of the circumstances under which the[] [statements] were made"); Ganem v. InVivo Therapeutics Holdings Corp., 845 F.3d 447, 455–56 (1st Cir. 2017) (finding plaintiff's omission theory insufficient where the complaint failed to allege facts "necessary . . . for the statements to have been misleading when made"). While plaintiffs generally allege in the alternative that all of the alleged misrepresentations discussed above also omitted material facts concerning LTC customer loss, we simply cannot infer from this complaint that any of the alleged statements were misleadingly incomplete for largely the same reasons we cannot infer their falsity -- the complaint provides too little basis for comparing any material conclusions implied by the statements against the contemporaneous state of the LTC business.

This observation also captures the final category of statements, which are only alleged as misleadingly incomplete, rather than directly false: CVS Health's "boilerplate risk factors" that warned of the possibility that the company would not realize benefits from its acquisitions because of, among other risks, difficulties with retaining customers. We have recognized that warnings or disclosures in the securities context that frame risks as merely hypothetical may be misleading when they resemble the "Grand Canyon" metaphor, in that "one cannot tell a hiker that a mere ditch lies up ahead, if the speaker knows the hiker is actually approaching the precipice of the Grand Canyon." Karth, 6 F.4th at 137. However, we have also clarified that, in the context of a section 10(b) claim, a speaker warning of a hypothetical risk only acquires a duty to disclose further known information about the extent of that risk when "the alleged risk had a 'near certainty' of causing 'financial disaster' to the company" or where the warned-of risk "had already begun to materialize." Id. at 137-38 (quoting Hill v. Gozani, 638 F.3d 40, 59-60 (1st Cir. 2011)).

Plaintiffs assert that the LTC business's loss of goodwill value due to customer flight was just such a "near certainty" -- throughout the entire class period -- because these losses had already begun to materialize as of the first such risk statement made in the February 2016 Form 10-K that kicked off the

- 26 -

class period. But, again, and as we recently noted in another case rejecting a Grand Canyon comparison, "[w]hether or not this assertion is true we cannot determine because the . . . plaintiffs simply do not plead sufficient allegations allowing us to do so." Ponsa-Rabell, 35 F.4th at 36. As we have already explained, the complaint fails to provide the information necessary to infer that there was any material net loss of customers that was not timely reflected in the 2016 write-off. A fortiori, it hardly suffices to allege in conclusory terms that the failure of the acquisition was a "near certainty." Our caselaw on this variety of omission theory "does not require a company to be omniscient, even if the company looks foolish in hindsight for not properly predicting whatever harm befell it." Karth, 6 F.4th at 138.

In sum, as it is plaintiffs' burden to plead specific facts "showing that the statements presented to the public were false or misleading at the time they were made," Suna v. Bailey Corp., 107 F.3d 64, 69 (1st Cir. 1997), their failure to do so means they have failed to allege the necessary element of a misrepresentation or omission of material fact. See Gross, 93 F.3d at 993 ("Though Gross adamantly contends that the statement is false, the amended complaint provides little in the way of specific facts to support this contention."). Accordingly, we agree with the district court that the complaint fails to allege a violation of section 10(b) or Rule 10b-5.

**B.**

We turn our attention, finally, to plaintiffs' efforts to be allowed a third bite of the apple in the form of a second amended complaint. By the time defendants filed their motion to dismiss, plaintiffs had once amended their complaint already, so they no longer had a right to amend the pleading again without the agreement of defendants or leave of the court. See Fed. R. Civ. P. 15(a)(1). Such leave, though, would have been "freely given" had plaintiffs asked and "justice so require[d]." Id. In short, when plaintiffs received the motion to dismiss spelling out what defendants claimed to be gaps in the amended complaint, plaintiffs could have sought leave to amend their pleading yet again. Whether the court would have allowed the motion, we do not know, because plaintiffs never filed it.

Instead, plaintiffs simply included in their memorandum opposing the motion to dismiss a brief note asking for a conditional opportunity to move for leave to amend, "if the Court grants any portion of the [m]otion [to dismiss]." No motion or argument was advanced in support of this request. Nor was any proposed amendment filed. The district court treated this "contingent" request as holding "no legal significance." City of Mia. Fire Fighters' & Police Officers' Ret. Tr. v. CVS Health Corp., 541 F. Supp. 3d 231, 233 (D.R.I. 2021). We see no reason to treat it otherwise. See Abiomed, 778 F.3d at 247 ("No proper

- 28 -

request [to amend] was made to the district court, only a mention in a footnote in their opposition to dismissal."); Fisher v. Kadant, Inc., 589 F.3d 505, 509 (1st Cir. 2009) (reiterating that a contingent request to amend a complaint contained in an opposition to a motion to dismiss "does not constitute a motion to amend a complaint" (quoting Gray v. Evercore Restructuring L.L.C., 544 F.3d 320, 327 (1st Cir. 2008))). It therefore stands to reason, a fortiori, that plaintiffs' conditional request cannot "transmogrify [a] post-judgment motion for reconsideration into a Rule 15(a) motion." Fisher, 589 F.3d at 511.

When the district court then dismissed the first amended complaint, it did so with prejudice. That approach is disfavored, at least when dealing with a complaint that has not been previously amended, but is nevertheless allowed within the discretion of the district court. See In re Genzyme Corp. Sec. Litig., 754 F.3d 31, 47 (1st Cir. 2014).

Once judgment was entered, Rule 15 was no longer on the table. Rather, plaintiffs first needed to get the judgment set aside. See id. at 46. Toward that end, they filed their unsuccessful Rule 59(e) motion to reconsider the court's order dismissing their complaint. A district court may grant such a motion "where the movant shows a manifest error of law," "newly discovered evidence," or "an error not of reasoning but apprehension." Ruiz Rivera v. Pfizer Pharms., LLC, 521 F.3d 76,

- 29 -

81 (1st Cir. 2008) (first quoting Kansky v. Coca-Cola Bottling Co. of New England, 492 F.3d 54, 60 (1st Cir. 2007), and then quoting Sandoval Diaz v. Sandoval Orozco, No. 01-1022, 2005 WL 1501672, at *2 (D.P.R. June 24, 2005)). "The granting of a motion for reconsideration is 'an extraordinary remedy which should be used sparingly.'" Palmer v. Champion Mortg., 465 F.3d 24, 30 (1st Cir. 2006) (quoting 11 Charles Alan Wright et al., Federal Practice and Procedure § 2810.1 (2d ed. 1995)). We review challenges to the denial of a Rule 59(e) motion for manifest abuse of discretion. Ruiz Rivera, 521 F.3d at 81.

Plaintiffs rely on a claim of newly discovered evidence. A party asking a court to reconsider its judgment on this basis must show "that [it] could not in the exercise of reasonable diligence have obtained [the] new evidence earlier." In re Biogen, 857 F.3d at 46. So, we focus on what plaintiffs knew or reasonably could have learned "before the district court entered its order of dismissal." Id.; see also Advest, 512 F.3d at 57 ("The plaintiffs argue . . . they were entitled to wait and see if their amended complaint was rejected by the district court before being put to the costs of filing a second amended complaint. . . . Plaintiffs have it exactly backwards.").

The Proposed Second Amended Class Action Complaint (PSAC) plaintiffs included with their Rule 59(e) motion identified twenty-five new CWs, seventeen of whom were drawn entirely from

- 30 -

another complaint against CVS Health filed in September 2020, and eight of whom were identified by plaintiffs' investigators. The district court did not clearly err in finding that the allegations that were lifted directly from the September complaint were easily discoverable through due diligence well before the dismissal order the following February. As to the remaining set of eight new CWs, plaintiffs point to only two in arguing that this evidence could not have been discovered before the dismissal. Those two CWs were still employed by CVS Health "when Plaintiffs were preparing the Complaint," with one employed there until October 2020, "after motion to dismiss briefing and oral argument were completed." Thus, even plaintiffs' presumptively best examples of late-discovered evidence were nonetheless available to them at least three months before the court dismissed their complaint. Of course, plaintiffs in suits of this type may have good grounds for seeking a reasonable period of time within which to gather and synthesize newly available information. But in that event, they should notify the court of their supplemental investigation so that the court can consider delaying its ruling in anticipation of the filing of an amended complaint. See In re Biogen, 857 F.3d at 46 ("[T]he plaintiffs could have alerted the court to their intentions earlier, but did not."). Plaintiffs here gave no such notice, so the "argument that the district court abused its discretion by failing to account for the time the plaintiffs needed

to vet the evidence . . . has no force."  Id.  As the district court below noted:

> Even if they did not at that time know of the full extent of the testimony they could obtain from these eight confidential witnesses, they could have moved to amend and requested leave for an extension of time in which to submit the proposed amended complaint. Instead, for five months, they simply waited and hoped for a favorable decision.

CVS Health, 541 F. Supp. 3d at 234.

Finally, plaintiffs argue that the combined effects of our precedent as applied by the district court lead to a "manifest injustice" to the detriment of meritorious claimants.  Of course, the same could be said when any significant deadline or procedural rule is enforced.  Moreover, whether the proposed amendment would have itself withstood a motion to dismiss is hardly clear.  Even in plaintiffs' briefs on appeal, they point to no new allegations in the PSAC that would connect defendants' public statements with contradictory contemporaneous facts or would demonstrate that the further anecdotal losses described by the new CWs materially exceeded the losses recognized by CVS Health itself in the pertinent time frames.  So this is not a case in which a manifestly meritorious claim has been lost due to any delay by counsel.

There are also off-setting, prudential considerations.  As we have previously noted, "allowing plaintiffs to hedge their bets by adding a cursory contingent request in an opposition to a

motion to dismiss would encourage plaintiffs to test the mettle of successive complaints and freely amend under Rule 15(a) if their original strategic choices prove inadvisable." Fisher, 589 F.3d at 510; see also Advest, 512 F.3d at 57 (explaining that honoring this combination of conditional and post-judgment requests "would lead to delays, inefficiencies, and wasted work"). Thus, entirely apart from any leniency in granting proper motions to amend a complaint under Rule 15, "[p]laintiffs may not, having the needed information, deliberately wait in the wings . . . with another amendment to a complaint should the court hold the first amended complaint was insufficient." Advest, 512 F.3d at 57.

For largely the same reasons, plaintiffs miss the mark in their last-ditch argument that the district court's denial of leave to amend here would permit dismissing PSLRA complaints with prejudice and without leave to amend in every case. First, we do not know how the district court would have treated a properly filed motion to amend here because plaintiffs did not file one. See CVS Health, 541 F. Supp. 3d at 233 (noting, for example, that plaintiffs here failed to attach an amended complaint to their conditional request for leave to amend, as required by local rule). Second, there is no basis for contending that in this case the grounds for the dismissal were somehow a surprise. To the contrary, they were the focus of defendants' briefing. See Abiomed, 778 F.3d at 247 ("[P]laintiffs were put on notice of the

deficiencies in the complaint by the motion to dismiss. If they had something relevant to add, they should have moved to add it then. . . . We wish to discourage this practice of seeking leave to amend after the case has been dismissed."). Third, we reiterate that plaintiffs' basis for seeking leave to amend was an ongoing investigation about which, prior to dismissal, they never informed the court. Fourth, the dismissal came twenty-four months after plaintiffs commenced this action and seventeen months after defendants filed their motion to dismiss explaining why they contended that the complaint was deficient -- certainly long enough to allow the district court to assume that the table was set for a final disposition. Accordingly, our ruling today does nothing to discourage district courts in their discretion from staying rulings to allow for reasonable due diligence, from temporarily postponing the entry of judgment after granting a Rule 12(b)(6) motion, see 1 Steven S. Gensler & Lumen N. Mulligan, Federal Rules of Civil Procedure, Rules and Commentary, Rule 15 ("[l]eave to amend after dismissal of complaint but before final judgment"), or from granting motions to reconsider dismissal when due diligence uncovers new evidence that was previously unavailable.

In sum, the district court did not abuse its discretion or commit a legal error when it denied plaintiffs' Rule 59(e) motion.

**IV.**

For the foregoing reasons, the district court's orders dismissing plaintiffs' complaint and denying the motion to reconsider are <u>affirmed</u>.